UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA   :

      v.   :   Crim. No. 06-107 (GK)

DEWAYNE JACKSON   :

DEFENDANT'S MOTION TO RECONSIDER MOTION TO SUPPRESS EVIDENCE
AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Mr. Dewayne Jackson, the defendant, through undersigned counsel, respectfully moves this Honorable Court to reconsider its June 12, 2006, Order, denying Mr. Jackson's Motion to Suppress Evidence. In support of this motion, counsel submits the following.

Procedural and Factual Background

Mr. Jackson is charged in a one count indictment with unlawful possession of a firearm and ammunition by a person previously convicted of a crime punishable by a term of imprisonment exceeding one year. The charge arose out of an incident that occurred on March 30, 2006. On that date, officers of the Metropolitan Police Department arrested Mr. Jackson.

On May 26, 2006, Mr. Jackson, through counsel, filed a Motion to Suppress Evidence and Incorporated Memorandum in Support and Request for Evidentiary Hearing. In the motion, Mr. Jackson asserted that the use as evidence of the a gun and ammunition seized on the date of his arrest should be suppressed because these items were the fruit of an unlawful stop of Mr. Jackson. In response, the government filed Government's Opposition to Defendant's Motion to Suppress Evidence on June 5, 2006. On June 12, 2006, the Court held a hearing on Mr. Jackson's motion.

Following the hearing, the Court made the following factual findings:

>The government put on two witnesses to testify in this hearing, Officer Michael Newton and Officer Michael Jewell.
>
>* * *
>
>Even though Officer Jewell testified second, he gave the basic factual background about how the events in question occurred.
>
>The police had been working with one of their confidential sources. The source knew that either one or two arrest warrants were outstanding for a particular suspect, and I don't believe that we ever had the name of that suspect presented in this record, and indeed the name of that individual is not relevant to the motions hearing today.
>
>Officer Jewell testified that this confidential source had proved reliable in the past. The confidential source knew the suspect they were looking for.
>
>On the day in question, namely August – I'm sorry, namely March 30, 2006, the source informed Officer Jewell that the suspect in question was sitting on the front steps at 1418 First Street, Southwest in Washington, D.C.
>
>As I have indicated, that confidential source, who had proved reliable in the past, knew the individual in question.
>
>In addition, the confidential source gave the police a clothing description of that individual, and told the police that that individual was in possession of crack cocaine.
>
>In addition the confidential source told the police that if the individual fled from the front steps of that apartment building that that suspect would be fleeing into either apartment 11 or apartment 12 inside the building.
>
>That is the background of what occurred.
>
>On the date in question March 30, 2006, Officer Jewell and a number of other police officers went to the address at 1418 First Street, Southwest.
>
>Officer Jewell organized matters in advance. He indicated that he and two other officers would go around to the back of the apartment building in case anybody fled from the back of the apartment building.
>
>Other officers were directed, and that included Officer Newton, to cover the front of the apartment building.
>
>When the officers pulled up to the address in question they

observed a number of individuals sitting on the stoop or it (sic) the front area. As soon as those people saw the police draw up they all ran, and they ran inside the apartment building.

Officer Newton gave the testimony as to what he observed occurred from there on in.

The apartment building's front door was locked to the public for security reasons. And so therefore, when the people sitting on the stoop ran inside Officer Newton tried to get inside. The door, as I have indicated, was locked. He managed to essentially jimmy the lock open from the outside.[1]

He had been told either by Officer Jewell or the confidential source what I indicated earlier, namely that if people fled they would be fleeing to either apartment 11 or apartment 12.

Officer Newton went up to apartment 11. He knocked on the door. At that point he was standing outside the door to the apartment in the hallway – in the common hallway in the apartment building.

A female voice called out, who is it? Officer Newton responded, police. A woman opened the door. Officer Newton remained outside the apartment door in the common hallway.

He asked the woman, are you alone? She responded no, her boyfriend was there. Officer Newton asked if he could speak with him? (Sic). The woman left the door open and called out to someone, presumably her boyfriend, but she called out to someone, come talk to the police.

She repeated it a second time, and Officer Jewell – I'm sorry, Officer Newton explained that the second time as she called out to this person to come talk to the police she was moving her hand in a way as to wave the person forward to come talk to the police. That person, however, was not visible to Officer Newton.

At that point Officer Newton heard a lot of commotion in the back, and he heard a woman, again presumably the woman who had answered the door, but not necessarily so, he heard a woman starting to scream, or screaming I should say.

He also at the same time – and all of these events occurred very quickly in a very short time frame. At the same time Officer Newton on his radio got a message from Officer Jewell to the effect of – or to the effect that Officer Jewell had a subject coming

---

[1] Officer Michael Newton testified that there was a small window in the door to the building. Motions Hearing Tr. at 25. "It actually has Plexiglas. It is not glass. The glass had been broken out. There was a small slot at the bottom, and I took a tire iron and stuck it through and grabbed the door handle from the inside." Id.

3

out the rear with a gun.

During all of this brief period of time, Officer Newton was standing in the common hallway outside the apartment. However, upon hearing he commotion in the back of the apartment, a woman's voice screaming, and the radio transmission from a fellow officer that there was someone coming out of the rear with a gun, Officer Newton at that point entered the apartment.

While it is not totally relevant or really not relevant to my rulings on this motion, Officer Newton did enter the apartment and ultimately arrested three other people in the apartment.

What is relevant is that he went to the bedroom in the rear of the apartment and observed a screen that was pushed out, although not completely pushed away from the building, and that screen is contained or pictured, I should say, in the government's exhibit number two and government exhibit number one.

At no time did Officer Newton have any contact whatsoever with Mr. Jackson.

To be a little more specific, when the officers first got to the address in question they saw approximately eight people in the courtyard, and two to three people right in the area in front of the address in question at 1418 First Street, Southwest.

When Officer Newton walked into that back room where the screen was pushed out, he saw below the window a handgun. He also saw Mr. Jackson lying face down on the ground below the window, handcuffed at that point, and surrounded by several police officers at that point. At that point Mr. Jackson was less than 10 feet from the handgun in question.

Officer Jewell provided information about what he observed from the back of the building. And I should note that both officers made in-court identifications of Mr. Jackson.

As I indicated earlier, Officer Jewell and two other officers when they got to the address at 1418 First Street, Southwest, ran around to the back of the building as planned. The area they went to was a public area that was totally open to anyone who happened to be there from the public.

All of the officers tried to hide themselves either behind a dumpster, or behind a wall, or whatever was available so that it would be difficult for anyone inside the apartment building to observe them back there.

Officer Jewell indicated that he didn't know which windows belonged to apartment 11 and which windows belonged to apartment 12.

Within a very short period of time Officer Jewell saw

movement at a particular window. He saw an individual who he later learned was Mr. Jackson, the defendant, look out of the window.

He saw that same individual kick the screen up. The screen came out from the bottom of the window, but as I indicated earlier, it did not completely break off of the window.

At that point the defendant himself, Mr. Jackson, pushed himself out from the window. In the first few seconds the defendant had his back to Officer Jewell.

However, in getting himself out of the window the defendant turned, and officer Jewell testified credibly that he saw a gun in the defendant's left hand. At that moment he immediately radioed to all of the other officers who were involved in this effort that a man with a gun was coming out of the window.

Officer Jewell testified very specifically and repeatedly that as the defendant hit the ground, and the testimony was that the window was a fair piece from the ground, somewhere between 10 to 20 feet, but as the defendant came out and hit the ground the gun came out of his hand.

Officer Jewell made it very clear that the gun was not thrown away or abandoned in any way by the defendant. What he could not say was whether it the impact itself of hitting the ground from that height and cause to the gun to be dropped or whether the defendant dropped it accidentally, or whether there was some other reason.

At that point Officer Jewell and the other officers immediately ran toward the defendant.

A the time that Officer Jewell saw the defendant start to come out of that window they were approximately 12 to 15 feet from each other.

No one touched the defendant before – no one touched the defendant or had any communication or contact with the defendant before Officer Jewell radioed everyone that he had a man with a gun coming out of the window.

Officer Jewell, of course, told the defendant to stop, which he did after taking a few steps. He was initially compliant. He laid faced down on the ground. He allowed himself to be handcuffed.

Thereafter, he became far less cooperative, became verbally abusive, and was somewhat physically difficult to control.

When the defendant was arrested he was approximately 15 to 20 feet from the gun. Officer Jewell testified that he had his gun drawn and drew it the minute he saw the defendant with a gun drawn.

> The gun itself, which is pictured in government's exhibit number three, was never left unguarded and was never touched before the picture in government exhibit number three was taken.
> Until the defendant was secured by the police there was no police officer between them and the gun. As I have indicated, the defendant was approximately 15 to 20 feet from the gun, and certainly was capable of retrieving it before the police had handcuffed him and put him in custody.
> I should note by the way that the police received the tip from their confidential source, who as I indicated had been reliable in the past, only about 15 minutes before arriving on the scene.
> The gun, when dropped by the defendant, landed right at his feet on the ground below the window in question.

Motions Hearing Transcript at 83-92. The Court then denied Mr. Jackson's motion, finding that the gun and ammunition were properly seized because they were in plain view and Mr. Jackson was properly arrested because the police testified that they had seen him with the gun in his hand. Tr. 92-93.

## Argument

Although Mr. Jackson disagrees with the accuracy of the testimony that formed the basis of the Court's factual findings, even assuming that those facts are true, the use as evidence of the gun and ammunition must be suppressed. The police officers violated Mr. Jackson's Fourth Amendment rights when they used a tire iron to break into the front door of his apartment building. Because this illegal entry set in motion a chain of events that led to the recovery of the firearm and ammunition, these items were the fruit of the illegal entry and their use as evidence must be suppressed.

The outer door that Officer Newton broke into with the tire iron led to a very small area. There are two apartments immediately inside the door Officer Newton broke through – one to the right and one to the left (the one Mr. Jackson lived in). In front of the door Officer Newton

broke through is a stairway, leading to another small landing and two additional apartments.

The police did not have a warrant to search the building or any apartment in the building. Although they had an arrest warrant for another individual, the police cannot enter a third party's home to execute an arrest warrant without a search warrant. Steagald v. United States, 451 U.S. 204, 215-16 (1981).

Moreover, Mr. Jackson had a reasonable expectation of privacy inside the door Officer Newton broke through. That door was locked and could be opened only from the inside or with a key. The area is not open to the public and the tenants have an expectation that others will not break through the door, using a tire iron.

The Ninth and Sixth Circuits have found defendants have a reasonable expectation of privacy under similar circumstances. See United States v. Fluker, 543 F.2d 709, 716 (9th Cir. 1976) (tenant of small apartment building had reasonable expectation of privacy in area inside outer door which was kept locked and led to common area between two apartments); United States v. Heath, 259 F.3d 522 (6th Cir. 2001) (apartment building tenant had reasonable expectation of privacy in common areas of building); United States v. Carriger, 541 F.2d 545, 552 (6th Cir. 1976) (when "an officer enters a locked building, without authority or invitation, the evidence gained as a result of his presence in the common areas of the building must be suppressed."). At least one judge of this Court (the Honorable Richard W. Roberts) similarly has found a reasonable expectation of privacy in an area between an outer door to a small apartment building and an inner apartment door, where a limited number of people had access to that area and the outer door was kept locked. See United States v. Drummond, 98 F.Supp.2d 44 (D.D.C. 2000).

Although some Circuits have found no expectation of privacy in common areas of apartment buildings, these cases are distinguishable because they involved larger apartment buildings with greater public access and/or the police did not break through the outer door of the building. See, e.g., United States v. Acosta, 965 F.2d 1248, 1252 (3d Cir. 1992) (no reasonable expectation of privacy in hallway of apartment building where police entered building through unlocked outer door).

According to the police officers who testified at the June 12th hearing, Mr. Jackson jumped out of the apartment window after learning that the police were at the apartment door. Absent the officer's illegal entry into the building, the police would not have been at that door and Mr. Jackson would not have jumped out of the window. Because the illegal entry into the building led to Mr. Jackson (according to the police officers) jumping out of the apartment window with a gun in his hand, the gun and ammunition are fruits of the illegal entry. See Heath, 259 F.3d at 534. In Heath, the court found that even a tenant's subsequent consent to search his apartment did not purge the taint of the illegal entry. Id. "[I]t was the officers' illegal entry into the common areas of the building that led them to [the tenant's] door. Consequently, the consent for the ensuing search and the illegal drugs must be suppressed because they were 'gained as a result of [the officers'] presence in the common areas of the building.'" Id. (quoting Carriger, 541 F.2d at 552); cf. United States v. Brady, 842 F.2d 1313, 1315 n.7 (D.C. Cir. 1988) ("abandonment will not be recognized when it is the result of illegal police conduct"). Similarly, it was the illegal entry that led to officers' presence at the apartment door and Mr. Jackson jumping out of the window. Thus, the gun and ammunition that allegedly fell from Mr. Jackson as he jumped from the window were the fruits of the illegal entry.

Conclusion

      For the foregoing reasons and such other reasons as may be raised at a hearing on this motion, Mr. Jackson respectfully moves this Honorable Court to reconsider its order denying his Motion to Suppress Evidence and enter an order suppressing the use as evidence of the gun and ammunition recovered by the police on March 30, 2006.


                                          Respectfully submitted,

                                          A.J. KRAMER
                                          Federal Public Defender


                                          "/s/"
                                          Michelle Peterson
                                          Assistant Federal Public Defender

                                          "/s/"
                                          Mary Manning Patras
                                          Assistant Federal Public Defender
                                          625 Indiana Avenue, NW
                                          Suite 550
                                          Washington, D.C. 20004
                                          (202) 208-7500